ESTILL *et al. v.* NEW YORK, L. E. & W. R. Co.

LEONARD *et al. v.* SAME.

*(Circuit Court, W. D. Missouri, C. D.* November 19, 1888.)

1. VENUE IN CIVIL CASES—FOREIGN CORPORATIONS.
 Under Rev. St. Mo. 1879, § 3481, subd. 4, providing that when all the defendants are non-residents of the state, suit may be brought in any county, a foreign corporation having an office in the state may be sued in any county thereof.

2. CARRIERS—LIVE-STOCK SHIPMENTS—INJURIES—EVIDENCE.
 In an action against a railroad company for injuries to cattle in a collision, many of which were cows with calf, it was shown that 5 cows lost their calves in the course of the journey on the cars, and within a day or two after the collision; that other miscarriages to the number of 103 occurred in the herd at short intervals during 90 days after the collision. There was testimony tending to show that the transportation of pregnant cows by rail would not be apt to produce miscarriages. Experts testified that several miscarriages occurring in a herd of pregnant cows would quite likely cause other cows to abort that had sustained no physical injury. *Held,* that there was sufficient evidence to warrant a jury in finding that all the abortions were the result of the collision.

3. SAME—MEASURE OF DAMAGES.
 In such case, the cattle being imported stock intended for breeding purposes, and the weight of testimony being that the value of a cow as a breeder is permanently depreciated by suffering a miscarriage, *held,* that the measure of damage for the abortions, if found to have been occasioned by the collision, was the difference between the value of the animals at the point of destination in their injured condition and their value at the same place if delivered uninjured.

4. SAME—VALUE OF CATTLE—NOTICE TO CARRIER.
 Defendant's liability for damages for its negligence is not lessened by the fact that it received no notice from plaintiffs that the cattle received for shipment were intended for breeding purposes; especially where it knew that they had been imported from Europe, and were being shipped westward, away from the markets for beef cattle.

At Law. On motion for new trial.

These are actions by Estill & Elliott and by Leonard Bros. against the New York, Lake Erie & Western Railroad Company for injuries to stock. There was a verdict for plaintiffs in each case, and defendant moves for a new trial.

*Draffen & Williams, Cosgrove & Johnson,* and *O. Guitar,* for plaintiffs.
*Pollard & Werner* and *James A. Buchanan,* for defendant.

Before THAYER and PHILIPS, JJ.

THAYER, J. These cases were tried together before me while holding the circuit court in the central division of the western district of Missouri during the illness of the late Judge KREKEL. At my request, Judge PHILIPS sat with me on the hearing of the motion for a new trial, and subsequently examined the stenographer's report of the testimony. At my solicitation, he has prepared and forwarded to me a written statement of his views touching the merits of the motion. The views expressed by Judge PHILIPS (which are herewith submitted) are so comprehensive of the questions raised by the motion for a new trial, and are so fully in accord with my own, that I shall only supplement what he has said by a few additional observations, chiefly concerning the contention that the damages are excessive.

In the Estill & Elliott case the evidence tended to show that 3 bulls, valued at from $500 to $600 each, were so badly injured that the 3 were eventually sold for about $200; that from 10 to 15 cows were bruised or maimed in various ways, so as to effect their market value; and that at least 13 cows dropped their calves prematurely. In the case of Leonard Bros. the evidence tended to show that 7 head of cattle, valued at from $3,500 to $4,000, were either killed outright by the collision, or were so badly hurt that they were abandoned at Nankin, Ohio, where the collision occurred; that 13 head of cattle, worth, on an average, $500 each, or $6,500 in the aggregate, died of injuries received, after their arrival in Missouri; that from 30 to 40 other animals (bulls and cows) sustained injuries of a character that materially depreciated their market value; and that 95 cows dropped their calves prematurely. In both cases the evidence tended to show that the injured animals were worth, on the average, if unhurt, from $400 to $500 per head. The evidence further tended to show that if a cow from any cause drops her calf prematurely, it permanently lessens her market value as a breeder; that, as a general rule, an accident of that kind, if it becomes known, reduces the value of the animal to what she will sell for as beef; and that a miscarriage destroys, in a great measure, the value of an animal as a breeder, in the estimation of stock-raisers. It was further shown that, as beef cattle, the cows were not worth to exceed $30 or $40 per head. The jury may have found, and no doubt did find, that all the foregoing facts were established by the testimony, and the damages were, quite likely, assessed upon that theory. If the jury also found that the numerous abortions in the herd were the direct result of the collision, and allowed damages on that account, as well as for the other injuries above mentioned, the amount of the verdict in each case is readily explained, in a manner consistent with the facts as found by the jury. In my judgment, therefore, the court cannot say that the verdicts are excessive, and set them aside on that ground.

It is contended, however, that the rule adopted by the court to estimate the damages was erroneous; and that the evidence was insufficient to warrant the jury in holding the carrier liable for the abortions that occurred. Both of the questions have been considered by Judge PHILIPS, in the main decision, with his usual care and ability. I shall only add a few additional suggestions. Defendant's counsel apparently assumes that the fact that a cow lost her calf prematurely did not permanently lessen her market value; that such animals, or large numbers of them, at least, by careful treatment would regain their capacity to breed regularly, as well as their original or normal value. On this hypothesis, defendant's counsel contend that plaintiffs should have been compelled to trace the subsequent history of each aborted cow, and that the measure of damage is what it may have cost to support and treat the animals during the period of disability, plus the depreciation in value at the date of the trial. Whether any allowance ought to be made for the loss of calves while the animals remained barren is not stated, and, apparently, is not considered. I apprehend that that is a very important element

of damage that ought to be considered, if defendant's theory of the measure of damages is adopted, inasmuch as the cattle were very valuable, and had been imported for breeding purposes, and the period of disability might last for two or three years, even if the animals eventually became regular breeders. In addition to the suggestion made by Judge PHILIPS that defendant's method of estimating the damage is not in harmony with a well-established rule on the subject, and, if adopted, would necessarily embarrass the trial of the cases with a multitude of collateral issues, I shall venture the suggestion that the argument advanced in behalf of that method of computing the damages also overlooks important testimony produced at the trial, which, in my judgment, has an important bearing on the question of the measure of damage applicable to the case. While it is true that there was some evidence that the market value of a cow, intended for a breeder, is only temporarily affected by a miscarriage, and that her capacity to breed regularly may be restored by proper treatment, yet the weight of testimony was that the value of a cow is permanently depreciated by losing her calf prematurely; and that men engaged in stock-raising will not usually buy such animals for breeding purposes, because they are generally regarded as uncertain breeders at best. If it be a fact that they are regarded by stock-raisers as uncertain breeders, and if it be true that the market value of an animal is permanently depreciated by suffering a miscarriage, no reason can be assigned why the damages allowed for the abortions, if they were occasioned by defendant's negligence, should not be the amount of the depreciation in value, estimated as of the date of the injury. An injury of that sort which permanently lessens the value of an animal, is like any other physical injury, and the damages awarded therefor should be arrived at by determining to what extent the injury lessens the market value. I shall only add that defendant's counsel have cited no authority which, on careful consideration, appears to me to sustain the position that they have assumed, touching the measure of damage. If it had been shown to the satisfaction of the court that the kind of injuries now under consideration did not permanently affect the value of the animals as breeders, there would have been more apparent reason for applying the rule which defendant's counsel invokes. But even if the rule invoked had been applied, and due allowance had at the same time been made for the cost of supporting the animals during the period of barrenness, as well as for calves lost in the mean time, it may well be doubted whether the rule would have operated to the advantage of the defendant. But, be this as it may, the testimony produced at the trial did not, in my opinion, warrant a departure from the ordinary rule.

I entertained some doubt, when the trial of these cases was concluded, whether the evidence, as a whole, was sufficient to support a finding that the carrier was responsible for all of the abortions. The question as to what caused them was one of more than ordinary difficulty, because it depended largely on inferences drawn from established facts, and upon the opinions of experts. It is an issue of fact that a jury is quite

as likely to decide properly as the court. Several experts, called as witnesses for the defendant, were allowed to state their opinion as to what caused the abortions, and the facts upon which their opinions were predicated. In this respect the rules of evidence were liberally interpreted in favor of the defendant. With reference to the opinions expressed by the experts, it will suffice to say that, after a careful consideration of the facts cited in support of their views, it appears to me that as many reasons can be given in support of the finding of the jury as against it. It appeared in proof that 5 of the animals lost their calves prematurely on the cars within a day or two after the collision; that similar miscarriages, to the number of 103 in both herds, occurred at short intervals during a period of 90 days, beginning with their arrival in Saline county. The greater number, however, occurred within a comparatively short period after their arrival at the point of destination. The testimony of all the experts tended to show, that several abortions occurring in a herd such as this would quite likely cause other cows to miscarry that had sustained no physical injuries; such latter abortions being the result of disease, or contagion engendered by the miscarriage of other animals. Judge PHILIPS has already remarked that some of the abortions may reasonably be attributed to the collision, because they were so closely related to it in point of time. He has further remarked that the time within which an animal would drop her calf in consequence of a physical injury, would in each instance be largely dependent on the nature of the injury, the state of pregnancy, and the constitution and temperament of the animal. I will add that such abortions as occurr  so long after the collision that they cannot reasonably be supposed to have resulted from actual physical injuries, may, according to the testimony of experts, be attributed to a contagion engendered in the herd as one of the immediate results of the collision. Whether the spread of such contagion in the herd could have been arrested by proper care on plaintiffs' part, was one of the issues submitted to the jury, under directions from the court, the propriety of which are not questioned. It may be plausibly argued (as it was before the jury) that the abortions were in great part due to change of climate, or to fatigue, or injuries naturally incident to a long railroad journey, or to the plaintiffs' negligence in failing to isolate cows that had aborted. The testimony in the case tended to show that the ordinary incidents of a long railroad journey would not be liable to seriously affect a pregnant animal, in that state of pregnancy which these cows appear to have reached. After a careful review of all the testimony, I conclude that there was evidence in the case from which the jury might rationally conclude, as they did, and as a former jury appears to have done, that the abortions were the result of the collision. It may be conceded that the finding of the jury in that respect rests wholly upon inference and upon expert testimony, and that no one can affirm with certainty that the finding is right. That, however, is not a sufficient reason for setting the verdict aside. The verdict rests upon sufficient testimony, in my judgment, to warrant reasonable men in finding such a verdict; and, under such circumstances, it should be permitted to stand.

I accordingly concur in the view that the motion for a new trial should be overruled, if the plaintiffs in case No. 2,024 [*Leonard et al.* v. *R. Co.*] elect to remit that portion of the verdict that is in excess of the sum claimed in the petition.

PHILIPS, J.    *Jurisdiction.*  My conclusion is that a foreign corporation having an office in this state is, under the present statute, to be treated as a non-resident defendant; and the provision of subdivision 4, § 3481, Rev. St. Mo., applies, and therefore the suit could "be brought in any county." It seems to me that the provisions of statute invoked by defendant must necessarily refer and be limited to domestic corporations. Judge HOUGH, in *Stone* v. *Insurance Co.*, 78 Mo. 658, said:

"The defendant, being a non-resident of the state, was subject to suit in any county in this state, (Rev. St. § 3481,) and could be personally served in the manner pointed out by the section under consideration."

It may be conceded to defendant's counsel that the enunciation was not essential to the determination of that case; but it does not necessarily follow that the authority of this declaration can be waived by calling it a mere *obiter dictum.*  It in no unmistakable language indicated the view of the state supreme court; and I am the more inclined to attach importance to it from the known fact that Judge HOUGH was a careful writer, and was not given to inconsiderate expressions in matters of statutory construction. There can be no question but that if this cause had remained in the state court, and the defendant, after moving to suppress the sheriff's return, had pleaded and gone to trial on the merits, the defective service would have been waived. *Kronski* v. *Railroad Co.*, 77 Mo. 362; *Scovill* v. *Glasner*, 79 Mo. 454, 455. And it does seem to me that where a party has thus removed the cause into the federal court, and tried it on its merits, had one new trial, and has again retried it on the merits in its own approved jurisdiction, it would be trifling with the administration of justice to allow it to escape judgment on the ground that it had never been in court. As said in *Scovill* v. *Glasner, supra:*

"He ought not to make the court a place of chance and appeal only when he has failed on another accepted issue."

*Abortions.*  An examination of the evidence on this issue shows that it presented conflicting views and facts, bringing it especially within the province of a jury to try and draw such inferences and conclusions as to them might seem reasonable. In several instances the abortions followed so early after the collision, while *en route*, and immediately after reaching the destination, as to make it quite probable that they were the direct result of the injury. In other instances the evidence was such as might well have justified the jury in concluding that other causes, independent of the collision, may have occasioned the injury. But whether or not such independent causes, or all combined, constituted the *causa causans*, is not so apparent to my mind as to authorize the trial court to take the case, as to the whole or any part, from the jury. The proxi-

mate relation between the time of the injury and the time of abortion can have no defined limit as a matter of law. So much depends upon the constitution, temperament, and physical condition of the animal at the time that it must remain largely a question of fact and legitimate speculation whether or not the loss resulted from the injury. In this view I attach no great importance to the fact, suggested by counsel, that some of the cows apparently more seriously injured in the collision did not abort until some time after others seemingly less injured. Much would depend upon the peculiar nature of the injury, the state of pregnancy, the concussion in the region of the womb, and the constitutional temperament and health of the animal. The difficulty a jury may encounter in the analysis of testimony, the separation of substance from speculation, and fact from conjecture, is no reason why the case should be withdrawn from their consideration. *Holcomb* v. *Bank*, 92 Pa. St. 338; *McCoy* v. *Hyatt*, 80 Mo. 139. It is only where the plaintiffs' evidence is such as to leave the jury to grope in darkness, with no substantial tangible facts to guide them, that the court should interfere. The moment the judge begins to adjust his judgment on considerations of the reasonableness of the jury's conclusion, drawn from disputable facts, there is danger of substituting his mind, his analysis and discrimination for that of the jury, and thus indirectly deny to the litigant his constitutional right of trial by jury. The charge given to the jury pointed out to them very clearly the different facts bearing on this issue; and, as they are supposed to have heeded the charge, the presumption is they were satisfied, from the evidence, that the abortions were traceable to the collision, rather than to any other reasonable source.

*Measure of Damages.* Criticism is made on this phraseology of the court's charge to the jury:

"Having received the cattle for the purpose of transportation, the defendant was bound, in law, to deliver the respective herds of cattle at the terminus of its line in as good condition as it received the same."

It is suggested that this language was too comprehensive, and was calculated to mislead, as it would include in the damages those incidents inseparable, in the exercise of reasonable precaution, from the transportation of live-stock; such as stiffness or soreness, or injuries done by one to the other, and the like. This language must be considered in connection with the whole charge, and construed with reference to the subject-matter, and the sense in which the jury of ordinary intelligence are to be presumed to have understood it. The subsequent part of the charge very clearly shows that the changed "condition" alluded to was such as resulted from defendant's culpable negligence as a carrier,—in other words, from the collision,—as that was the *gravamen* of the complaint, and the matter over which the contention was had. Nor do I think there was any hurtful error in this respect as applied to the special instance of the bull Lord William; for while the plaintiff's evidence tended to show that, in his apparent condition when landed in Saline county, he was seriously injured or worthless, it must be presumed the jury heeded the subsequent fact developed that plaintiff realized $715 in his

sale.   Under this head, counsel make two other objections to the ruling of the court.   One is that plaintiff should not have the benefit of the damages apparent at the time of the completion of the carriage; and the other, that they should have been required, by their evidence, to trace out the history of each animal sued for, and show the result of the injury and consequent damage at a period beyond the time of delivery at the end of the journey.   The argument is that the apparent condition of the animal may have been incident to mere travel, and, without further proof, the presumption would be that the animal soon recovered, and for such injury it is not liable as a common carrier.   This proposition inevitably leads to the second contention,—that the plaintiff should, in developing his case, go beyond the date of arrival in Saline county, and trace out the history of each animal up to the date of trial.   It is contended that the general rule of damages laid down by the court is applicable only to the carriage of inanimate substances, such as merchandise, and possibly to beef cattle destined to a known particular market, but not to cattle designed for ordinary use.   The only authorities cited in support of this proposition are *Streett* v. *Laumier*, 34 Mo. 469, and *Gillett* v. *Railroad Corp.*, 8 Allen, 560.   These cases but establish the rule that in the action of damages for an injury to a horse, where the animal recovers, the plaintiff may, under proper averments, recover for medicines and services in curing the animal, and his depreciated value up to the time of trial.   But this in no wise trenches upon the general rule that, in the action of damages for breach of contract by a common carrier for the tranportation of property injured *in transitu*, the measure of damages "is the difference between the value of the goods as, or in the condition when, delivered, and what their value would have been if they had not been damaged in the course of transportation." 3 Suth. Dam. 237; *Gray* v. *Packet Co.*, 64 Mo. 50.   I know of no distinction made in favor of live-stock.   The instance put by counsel as to the shipment of beef cattle, destined for a particular market, does not help his argument.   In that case the law will compel the shipper, if he had notice when he received the cattle that they are designed for a particular market, to pay the value of such cattle in that particular market on the date they should have been delivered, without regard to the market value at the termination of the route when delivered.   This is the exception to the general rule. So Sutherland, (volume 3, p. 242,) says:

"The carrier can be charged with no more than the market value there, unless he has contracted to carry it there to fulfil a contract of sale at a greater price."

And this author, both on reason and authority, in the same connection, proceeds to combat the proposition that the carrier should have the benefit of a contract by which the consignor was really to have less than the market value at the point of delivery, when the carrier had no notice of such subcontract.   The rule in question is one of protection to the carrier, and he ought not to be heard to complain of it.   Nothing is better established than that the plaintiffs, for the purpose of augmenting their damages, would not be permitted to show what they in fact did sell

certain of the cows for; although defendant might be permitted to do so (as was accorded to it in this case) for the purpose of showing that plaintiffs in fact were not damaged, or to the extent claimed. Why, then, require plaintiffs, in the first instance, to proceed affirmatively to trace out the subsequent history of each cow, when they could not enhance the measure of damages by showing that in the final disposition they received only so much for her? Again, such a rule would, in practice, lead to confusion, and involve the jury in the inextricable meshwork of collateral issues, and inquiries after facts absolutely unascertainable with any proximate certainty. Rules of law for the attainment of justice must be uniform and certain. The rule as to the measure of damages permits the plaintiff, up to the time of trial, to show the condition of the injured animal, merely as a means of ascertaining the result of the injury inflicted, so as to better enable the jury to fix the damages at the time and place of delivery. If the cows did subsequently abort, this is proof only of the extent of the injury inflicted; as much so as if they had subsequently died from the effect of the collision. The only known limit to the inquiry up to the trial is whether or not the subsequent development in the condition of the animal is traceable directly to the injury inflicted by the carrier. *Kuin* v. *Railroad Co.*, 29 Mo. App. 61, 62; *Sorenson* v. *Railroad Co.*, 36 Fed. Rep. 166, 167. The direct proximate consequences of a wrongful act are those which occur without any intervening independent cause; and the extent of time between the injury and the consequence does not affect the rule. *Brown* v. *Railroad Co.*, 54 Wis. 342, 11 N. W. Rep. 356, 911.

It is further insisted, in this connection, that the evidence, on the part of the defendant especially, tended to show that the effect of an abortion on a cow is too conjectural and uncertain to make it the basis of damages. To support this assumption, it is cited that a cow, having once aborted, may, under certain conditions of treatment and reletting to the bull, breed again, and that abortions may measurably be prevented by the isolation of the pregnant cow. But how do such facts affect the question of such injury and abortion depreciating the market value of the cow? As well say that the market value of a stallion is not affected by the fact that he is an uncertain foal-getter, or is certain only under favoring conditions of treatment and delays not common to other breeders. This very fact depreciates his market value, and proof of it should go to the jury for them to say to what extent it impairs his value. It is further urged that such damages are special, and not the natural and ordinary result of the injury. As well might it be said that in the case of a female passenger, in a state of pregnancy, receiving an injury in a collision, she might have recovered without difficulty or serious consequence but for the fact that she happened to be *enceinte*, and the injury brought on premature delivery, resulting in death. The railroad company could not attribute the death to the abortion, and escape damages consequent therefrom; for he whose negligent act puts in motion an instrument of mischief is answerable for the consequences directly flowing from the wrongful act. Defendant seems to complain

that plaintiffs were permitted to show that the cows were designed for breeders, and that it should not be held to the measure of damages without having notice of such fact when it made the contract of shipment; the result of which would be that, in estimating the market value of the cows, the standard would be their value for beef. If this were admissible, the facts and circumstances are such as to affect defendant with notice. It knew these cows and bulls were imported from Europe. They were not going east, in the direction of the beef market. Why were they being brought from abroad, and carried across the continent to the interior of Missouri? No jury, on such evidence, would be permitted by the court to find that defendant had a right to suppose that such cattle, consisting of bulls, cows, and heifers, were designed merely for beeves. No jury could hesitate to find from facts so obvious to the common sense of mankind that defendant had notice of the fact that such cattle were designed for breeding purposes. The learned counsel for defendant recognizes this obvious fact in his argument in this cause, where, on page 26, he says: "Seven head were sold in Denver in 1885. They were evidently sold as breeders, as cattle are not shipped there for beef." The fact that such cattle would likely breed, or not, would, in the ordinary course of things, affect their market value in Saline county, as the evidence abundantly shows; and if, by reason of the injury, that market value was depreciated, it is a consequential damage directly ensuing from the injury. The charge to the jury, in its separation and classification of the facts, clearly put the burden of proof on plaintiffs to show what damages were sustained through injuries and abortions. After plaintiffs made proof of the number of abortions, and the effect thereof on the market value of the cows, they had made out a *prima facie* case. The defendant was then accorded the right to follow up in detail the subsequent history of each injured animal, and show, if the fact existed, that the real damage was less than that claimed by plaintiffs. The fact that it may have been difficult or inconvenient for defendant to do this cannot alter the rules of law or evidence. The argument *ab inconvenienti* would often overturn most valued and deep-rooted rules. This is an entire misapplication of the rule of evidence, invoked by counsel, that the party in whose exclusive possession certain evidence is should produce it.

*Notice.* It is insisted with great zeal and ability by defendant that it should not be held to accountability for the result of the miscarriages of the cows, without proof of notice to it, at the time of their acceptance for transportation, that the cows were pregnant. The general rule on this subject is well stated in *Hart* v. *Railroad Co.*, 112 U. S. 340, 5 Sup. Ct. Rep. 151:

"As a general rule, and in the absence of fraud or imposition, a common carrier is answerable for the loss of a package of goods, though he is ignorant of its contents, and though its contents are ever so valuable, if he does not make a special acceptance. This is reasonable, because he can always guard himself by a special acceptance, or by insisting on being informed of the nature and value of the articles before receiving them. If the shipper is guilty of fraud or imposition, by misrepresenting the nature or value of the articles, he destroys his claim to indemnity."

So Sutherland on Damages (volume 3, pp. 243, 244,) clearly recognizes the liability of a carrier where he has failed to qualify his liability by a notice to the shipper, or qualification of the contract. Counsel for defendant, having to concede this general rule, contend that it is limited to the mere value of the property taken for transportation, but does not apply to the condition of the property. In support, we are cited to the *Nitro-Glycerine Case*, 15 Wall. 524. This case is not pertinent. It presented the question as to defendant's liability for injury to adjacent property occasioned by the explosion of a package of glycerine opened by him, without carelessness, in ignorance of its contents, which package was taken for transportation. It did not involve the question as to whether or not the carrier would have been liable for the loss or injury to the package taken by him in ignorance of its contents when received. In *Hart* v. *Railroad Co.*, *supra*, the shipper was not permitted to recover the actual value of his race-horses, injured in transportation, for the sole reason that he had by special contract limited the carrier's liability to a less valuation. The reading of this case, however, and the authorities therein cited, can leave no doubt that but for the special contract the carrier would have been liable for the inherent value of the racers, although unknown to it at the time of acceptance for transportation. The case of *McCune* v. *Railroad Co.*, 52 Iowa, 600, 3 N. W. Rep. 615, presents a case more in point. That was an injury in transportation to a cow with calf. While it is true the cow was so far advanced in pregnancy as possibly to have warranted the inference of notice of the fact, yet the opinion of the court is not so confined, but in unmistakeable terms the court lays down the law to be that shippers of live-stock are not required "to seek the agent of a carrier, and make known the physical condition of his stock." The opinion further says:

"As well require each passenger, upon purchasing his or her ticket, or upon boarding the train, to make known his or her physical condition, so that the carrier might exercise more care in running the train to avoid collisions or accidents from other causes."

Suppose a woman in a state of pregnancy, not obvious to the casual observer, should take passage on a railroad car, and through the negligence of the carrier receive an injury resulting in abortion, greatly impairing her general health and usefulness. In an action for damages, would not proof of this fact be competent in aggravation of damages as the direct result of the injury? and would it be any defense that, on taking passage, she did not notify the ticket agent and conductor that she was *enceinte?* I think these questions are answered adversely to defendant's contention in the cases of *Oliver* v. *Town of La Valle*, 36 Wis. 592; *Stewart* v. *City of Ripon*, 38 Wis. 591.

*The Verdict.* Time will not permit me to enter upon an analysis of the evidence to show whether or not there was evidence to reasonably justify the amount of the jury's award. The attention of the jury was clearly enough directed to the evidence touching the result of the injuries, and as to what number and character of cattle were affected. As a matter of course, what the plaintiffs paid for the cattle in Scotland,

and what they cost them landed in Saline county, could not be considered by the jury. There was evidence in the case to warrant the amount of the verdict. It is true that the conclusions of the jury must in part have been predicated upon expert testimony; but, if that testimony was competent, its probative force was for the jury. It would involve a contradiction in practice for the court to hold that certain evidence was admissible, for the establishment of a given fact, and then say that, although it carried satisfaction to the minds of the jury, the court would not abide the finding, as it may have been rather problematical than founded on known facts.